[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action was brought in two counts. The plaintiff claims the first count alleges two causes of action: a foreclosure of a mechanic's lien; and a breach of contract of the building agreement for the construction of a dwelling. The second count alleges a cause of action based upon "Unfair Trade Practices," G.S. Section 42-110 et seq.
FIRST COUNT
On the first day of trial, prior to commencing the taking of evidence, the court invited counsel into chambers to determine if there were some areas of agreement and whether some issues could be narrowed. It was immediately apparent that no agreement could be reached. It was at that time that the plaintiff's counsel informed other counsel that he was pursuing two courses of action in the first count. Counsel for the defendants vigorously protested that only one count, that of foreclosure of the mechanic's lien, was pleaded in the first count. The conference was immediately terminated and, in court, the defendants moved that the court restrict the plaintiff to the cause of action alleging a foreclosure of mechanic's lien. The court refused to make that determination at that time without some research on its part but stated it would be determined at the time the case was decided. There were no further motions or permission to amend on this issue during the trial that took about seven weeks. In the plaintiff's brief it is stated that if the defendants "claim that the plaintiff improperly combined in one count more than one cause of action they should have filed a Request to Revise to Compel Seperation [Separation]." CT Page 5625 The defendants did not seek to have the plaintiff plead two causes of action in separate counts but claimed that only one cause of action was pleaded and claimed that all through the trial.
The first issue to be determined is whether the first count fairly apprise the parties that two causes of action are pleaded. "A pleading must allege the facts upon which a party proposes to rely in such a way as fairly to apprise the court and the opposing party of his claims." Rusch v. Cox, 130 Conn. 26, 33; Volpe v. Gunder,129 Conn. 14, 17.
Reading the first count of the amended complaint, it is clear that a foreclosure of a mechanics lien is sought. It is not clear or reasonably apparent that it was also intended to set forth a cause of action in contract. Paragraphs two, four, seven and ten express the facts attendent to the underlying building agreement. However, an agreement is necessary to establish a basis for the mechanic's lien pursuant to G.S., Sec. 49-33 and, alleging the existence of a contract alone does not allege a breach of a contract.
In reviewing the file item 119 where there was a Request to Revise, dated June 7, 1989, the plaintiff sought to have the defendants Blonder specify the dates when payments were made it is noteworthy that it only alleged "[r]eason: [t]his is an action to foreclosure a mechanic's lien which was filed because of non-payment for labor and materials in the construction of a house." This is repeated seven times in the motion with no mention of a cause of action in contract. Further, in a brief dated October 23, 1989, objecting to the defendant's motion to file a counterclaim, the plaintiff states "[p]laintiff has brought suit to foreclose a mechanic's lien because of non-payment for labor and materials supplied in connection with the construction of a house and barn for the defendants Blonder." There is no mention in this seven page motion of a cause of action in contract or the effects of a counterclaim on a cause of action based on contract. Nowhere in the file is there any express pleading of a breach of contract or where it could reasonably be inferred that such was a cause of action.
The pleading in the first count tracts the form for the foreclosure of a mechanic's lien both in its pleadings and its claim for relief in "Connecticut Practice," Vol. 3, Kaye-Effron Form S-149, page 508. Although this is not controlling it is indicative that only a cause of action for the foreclosure of a mechanic's lien is clearly pleaded. It is the opinion of the court and it is found that the paragraphs in the first count cannot be viewed as being laid out so as to fairly apprise all concerned that in addition to a cause of action for the foreclosure of a mechanic's lien, that a separate and distinct cause of action in breach of contract was also pleaded.
The defendants claim that the mechanic's lien filed in the Hebron CT Page 5626 Town Clerk's office is defective to the point that it is of no effect and force because: the amount claimed as a lien is not correct; the date of commencement of the performance of services or furnishing of materials is not correct; the verification and oath are not properly dated; a true and attested copy of the certificate was not served upon the owners of the property; and, it is not filed by the person performing the service or furnishing the materials.
The amount claimed is $116,705.16 in the filed certificate. The amount claimed in court at the end of the plaintiff's president's direct examination is $46,064.46 in the first count. The evidence does not indicate any fraud by this misstatement and no one was injured by the fact that the debt claimed in the certificate was different than that claimed in court. Such misstatement does not render the lien invalid. Morici v. Jarvie, 137 Conn. 97, 102; Soule v. Borelli,80 Conn. 392, 399.
A copy of the certificate is attached to the complaint. Neither the certificate is dated nor is the acknowledgment. It is apparent that it is a copy of the certificate filed in the town clerk's office. That certificate is dated August 4, 1988 in both respects. When the filed certificate was dated is unknown, however, it was dated when filed. Even if the certificate had not been dated, "if it is sufficient in other particulars, the mere omission of the date . . . is not necessarily fatal." 1 Am.Jur.2d Acknowledgments, Sec. 47. See also 25 ALR2d 1141 and the case therein cited and 29 ALR 953 with cases therein cited. The fact that the certificate was undated for some time between its being prepared and signed and the filing in the town clerk's office is not fatal to the lien.
The date of commencement of the performance of services on the certificate is March 23, 1987. The court finds that actually work was started September 21, 1987. The reasoning in the case of Cole v. Uhl,46 Conn. 296, 299, is fully applicable to the situation in the instant case. That case involved completion date, however, the same rational would apply to the starting date as well. See Pierce, Butler Pierce Mfg. Corporation v. Enders, 118 Conn. 610, 615, where the court discusses substantial compliance. The error in the certificate misstating the time of commencement of work is not fatal to the lien.
The court believed the testimony of the sheriff that attested copies of the certificate was served at the place of abode of the defendants Blonder. See also Exhibit KK2. The court finds that a true and attested copy of the certificate was duly served upon each defendants Blonder.
The fact that the certificate was signed by the plaintiff's president (hereinafter referred to as Heath) and that the subcontractors were not signors or mentioned is of no moment. See New Haven Orphan Asylum v. Haggerty Co., 108 Conn. 232, for a detailed CT Page 5627 discussion of the mechanic's lien law since 1836 and the effects of later amendments to the original statute. The plaintiff was the one who hired the subcontractors to whom they looked for payment. The fact that some subcontractors may have filed liens against the plaintiff does not invalidate the plaintiff's lien. Those subcontractors that testified and were asked if they were paid in full and replied that they were not, all claimed that it was the plaintiff who owed them their debt.
It is claimed that even if any one defect might not be fatal, there were so many defects that the court should declare the lien unenforceable. It is found that the lien as filed and served was sufficient to satisfy the statutes and be in compliance with the cases cited. The certificate is sufficient to be the basis of a foreclosure.
As previously stated, the plaintiff commenced rendering services and materials on September 21, 1987. It is also found that the date when the plaintiff ceased to render services and materials was on June 3, 1988 when the defendants Blonder moved in and the plaintiff was forbidden to continue. As late as June 1, 1988, grading was being done on the premises. The dwelling was substantially finished on June 3, 1988. There remained some minor work to be done on both the main dwelling and the barn. Heath testified that such work amounted to $1125 principally for labor.
Paragraph eleven of the contract provides that if there are any changes or deviations from the plans by way of additions or deletions such shall be done only upon written change orders signed by all parties. What Heath has described as extras would be included in this paragraph. There was claim that if an extra was furnished or constructed, there could be no recovery without a written order by virtue of the contract. Query: whether in an action for foreclosure of a mechanic's lien where the statute makes the action one for materials and services, rather than breach of contract, such a defense is applicable. Actually the result would be the same if paragraph eleven was in or not in a contract. At any rate, the court will assume that the defense is applicable. Such provision may be waived by the parties. Von Langendorff v. Reardon, 147 Conn. 524, 528; Brian Construction Development Co. v. Brighenti, 176 Conn. 162, 169. "The general rule that no express contract is necessary to give a right to recover for services not covered by the contract and rendered without objection, where parties have expressly defined the work to be done and the amount to be paid therefore, applies to building and construction contracts." 13 Am.Jur.2d, Building, etc. Contracts. Sec. 19. There was one change order that was in writing which reduced the contract price when the Blonders wanted to change the heating system to one that was not as expensive as that listed in the contract. There was another bill for an extra early in the construction of the building. All other claimed extras by the plaintiff were provided without a written change order. Heath claimed that they were all CT Page 5628 verbally agreed to. Where the court allowed an extra, it was satisfied and found that it was agreed to by either one or both defendants. The fact that such were agreed upon verbally by the Blonders does not affect liability of the Blonders if they otherwise are recoverable. Brian Construction Development Co. v. Brighenti, supra.
In charging for extras, the plaintiff, in most instances but not all, in addition to its actual cost, added twenty-five percent for profit and overhead. Both of these items are recoverable but such must be proven with reasonable certainty. "[M]ere uncertainty as to the amount of lost profits may be dispelled by the same degree of proof as is required in other civil actions, that is, the amount may be determined approximately upon reasonable inferences and estimates." Burr v. Lichtenheim, 190 Conn. 351, 360. 22 Am.Jur.2d Damages, Sec. 171-172. In the instant action there was no credible evidence presented from which either profit or overhead could be actually determined or from which such could be determined reasonably approximate upon reasonable inferences or estimates. Heath did list some items of overhead but what such amounted to in dollars was not put into evidence. The court finds that twenty-five per cent for profit and overhead was not based on any reasonable inference or estimate of the actual overhead or profit of the plaintiff's operation but was an arbitrary figure of the president of the plaintiff at least from the evidence presented. See Expressway Associates II v. Friendly Ice Cream Corporation of Connecticut, 218 Conn. 476, 477. See also Brin v. Mesite, 89 Conn. 107, 110, as to recovery for profit. Further, there was no agreement between the parties of the contract for these items and there was no agreement that such would be charged.
In some instances, Heath, as president of the plaintiff charged $60 an hour for his time spent involved in the incorporation of the extras into the premises. At no time did Heath tell the Blonders that an hourly rate for his time would be added to the cost of the extras. The Blonders knew that extras would have to be paid for in addition to the contract price but sometime early in the fall when the job was just beginning and Heath gave Ira Blonder a bill for an extra, Heath was told that he should hold the charges for extras until the job was completed as Ira Blonder and Heath were to be involved in other ventures and that Heath would make such a profit on these other ventures that he would forgive the extras or words to that effect. No mention was made that $60 an hour would be tacked on the extras for supervisory or other time spent on extras. It is found that the Blonders were never aware that time spent by Heath involved in the incorporation of the extras into the premises would be charged in addition to the agreed contract price. In addition, whether $60 an hour :is a reasonable charge under the circumstances is unknown. No credible evidence was offered to show that such was a reasonable charge to be added to the extras or that a lesser or greater charge would be reasonable. Under these circumstances, this hourly charge attached to some extras is not considered. And, the contract signed CT Page 5629 August 12, 1987, does not mention any hourly rate in any respect for any time that Heath spent on the job or otherwise alerting the Blonders that such a charge would be made. Although not controlling, it is significant that as of June 3, 1988, at about the time the defendants Blonder moved into the dwelling the plaintiff gave them a bill dated June 16, 1988 in which there was no claim for profit and overhead or hourly charges when Heath was involved with extras (Exhibit JJ) and that later, another bill was given to the Blonders dated June 15, 1988 in which it first appears that the plaintiff was claiming both profit and overhead. (Exhibit CC). It is found that the hourly charges made by Heath for his time when involved with extras is not recoverable.
The contract was executed on August 12, 1987, and it was to be completed on or before March 31, 1988. Without going into specifics, it is the opinion of the court that the major portion of the delays were due in large part by the actions and requests of various nature by either or both of the defendants Blonder regarding the building of the dwelling. Again, this may not be relevant as the action is not for a breach of contract but for services and materials rendered.
The court is of the opinion that the cap of a contract price to any recovery (C.G.S. 49-36) allows extras that were agreed upon by the parties involved.
During the course of the trial, counsel for the plaintiff offered Heath as an expert on reasonable value of items that were to be testified as extras. After considerable direct examination and cross-examination, the court ruled that he could not testify as an expert in that regard. However, from the evidence given by him of the manner of his operation, his arm's length transactions with suppliers, subcontractors and with those whose labor was required to do the work, the court inferred in each instance where an extra was found, that the expenditures were reasonable. Rene Dry Wall Co. v. Strawberry Hill Associates, 182 Conn. 568, 575.
The following are the extras which the court finds proven by the plaintiff and the disallowance for other claimed extras. In no instance is there an allowance to Brad Heath for supervisory or other time spent on extras nor is there any allowance for profit and overhead as previously discussed.
The claim for plans is disallowed. It is within the contract.
Any charge for changing the size of a tub and later accepting the size of the original tub is disallowed as Heath told the defendants there would be no charge.
The charge of $439.82 for a hood over the range is allowed as an extra. CT Page 5630
The charge for the front door is disallowed as it includes profit and overhead and the cost is not separated.
Mrs. Blonder ordered a shelf on the wall in the bathroom. After some work was done she changed her mind. The cost of $387.53 is allowed as an extra.
The area of the deck was changed. The extra work amounted to $1247.84. Further comment will be made in explanation of this extra when commenting on an allowance to the defendants for the same deck.
Mrs. Blonder wanted a skylight changed from the loft to a bedroom. The cost of $75 is allowed as an extra as testified to by the framer.
Mrs. Blonder wanted two doors in a closet not in the original contract. The cost of $78.06 is allowed as an extra.
Mrs. Blonder was not happy with the door in the den. A new door was obtained. The cost of $39.87 is allowed as an extra.
After construction of the deck, Heath did additional work on it amounting to $183.97. This is disallowed.
The contract provided that if doors and windows were augmented, they would be extras. Mr. Blonder ordered a door and three windows added to the lower level. The cost of $1840.33 is allowed as an extra.
Mr. Blonder bought the palladian windows. The plaintiff gave him $5000 credit. The sum of $427 to put the windows together is allowed as extra.
It is unknown if the claim of $612.14 for work done on blocking under the eaves includes profit and overhead plus time to Heath. It is therefore disallowed. This also applies to the soffitt.
After the concrete was poured for the barn foundation, it was found that it faced the wrong way. Heath said he would correct it and he did. He claims a charge for extra cement but that is disallowed.
Mrs. Blonder was concerned about horses injuring their legs on the 2x4 studs. She ordered 2x6 studs. This extra cost of $2259 is allowed as an extra.
Mrs. Blonder wanted to upgrade the barn doors. Their cost of $1525 is allowed as an extra.
The plaintiff was told to sheath entire interior of the barn. The cost of $1387.05 is allowed as an extra. CT Page 5631
There was some mention of a cupola but later the court was told that the plaintiff was not pressing the claim.
The dwelling was built according to plan but raised 4.25 feet. It called for additional framing, concrete and grading. The cost was $959.24. The cost is allowed as an extra.
In the contract paragraph seven allows up to $20,000 for excavating, well and septic system. The court believes Denis Rau concerning his work of excavating and, and that his bills were reasonable. There was testimony that the cost of excavation was $61,160.99. However, in examining all the exhibits, the court found only bills for $51,415.74 and this is the amount accepted by the court. The difference partly includes Heath's time and overhead. Included in the bills was one for $2330 for leveling a hill not on the defendants' property. This bill is disallowed. Subtracting the $20,000 allowed as stated in the contract, leaves an amount of $29,085.74. This amount is allowed as an overage. Included in these bills is $9181 for excavating and materials for an underground conduit for utilities from the highway to the building site. This item cannot be reasonably inferred as being within the contract.
The total cost of the kitchen was $22,260.75. This price results from deducting $300 for Heath's time. The contract allowance was $20,000. The amount of $2260.75 is allowed as an overage.
As to the generator rental, the court is of the opinion that such is a contractor's expense which is within the contract price.
The contract allowed $2800 for light fixtures. The cost of the fixtures chosen by the defendants was $3302.99 making an overage of $502.99.
Mr. Blonder wanted a more expensive brick than the standard brick increasing the price by $500. While the mason was on the job, Mr. Blonder ordered a cap for the chimney which cost $600. These were extras amounting to $1100 and these are allowed. Although Heath testified the cap was $750, the mason stated the cost was $600.
The defendants requested a pine flooring in the half bath and hallway. The additional cost was $508.20 and allowed as an extra.
Mr. Blonder wanted a change in the stairs. Heath told him it would be $1000 over budget. Mr. Blonder said to go ahead. Plaintiff's cost turned out to be $2118.50. The extra is found to be $1000.
The defendants ordered shower doors which were not included in the contract. The cost of these doors was $579.27 which is allowed as an extra. CT Page 5632
The plaintiff claims $337 for extra trim around the palladian windows as they were larger than those in the contract. The court feels that such a deviation is not so great that an extra charge is warranted.
There was a change of size of the door in the den closet. The additional charge was $52.40 which is allowed as an extra.
The charge for two doors in the bedroom closets was $270.76 and $61.58 for additional shelving. These charges of $332.34 are allowed as extras.
In October Mrs. Blonder wanted a window moved to the barn and the extra cost of $58.36 is allowed.
The contract did not allow for a retaining wall. The defendants requested that one be built in front of the palladian windows. The cost of $4631 is allowed as an extra.
As to the stoop at the front door, Heath's testimony as to this item was confusing to the court. He claimed costs of $1480.92. Yet the mason who at least did some work on the stoop charged $400 "for the stoop." Only $400 is found as an extra for the front stoop.
The plaintiff seeks reimbursement for his cost to heat the job during the winter months. This was not in the contract as a distinctive charge and as previously stated the court does not feel it should be an extra. However, the payment of $810.87 for oil in the defendants' oil tank should not be considered to be within the contract and is allowed as an extra.
The charges for electricity are not charges that should be assumed by the builder. The plaintiff paid $89.20 and it is allowed as an extra. Sec. Exhibit Y.
During construction the parties had a conversation about the floor. The defendants wanted the floor to look old. Heath suggested cut nails. The defendants authorized him to use cut nails. The additional cost was $605. This is allowed as an extra.
The defendants wanted to upgrade the electrical work. Heath told them that he had allocated $6362 for the electrical work. The defendants acquiesced to this and they would order the upgrade from the electrician. His bill was $9187.62. The difference is an allowed extra for $2825.62.
Mrs. Blonder was selecting plumbing fixtures and Heath told her she was way over budget. Exhibit 21 appears to be a breakdown of allowances for various items including plumbing. It is dated 7/6/87. CT Page 5633 However, in examining the figure on that exhibit and the plumber's bills and the claim for extra, the figures don't fit and the court cannot determine what would be an extra. No allowance is made for an extra.
The claim for extra insulation to the back wall when the house was raised has not been proven.
Mr. Blonder said he would pay extra for gutters and down spouts on the barn. The cost was $225.58 and is allowed as an extra. As to the added leaders installed because of the raising of the building the cost is disallowed.
When the bathtub was to be changed and then changed back to the original length, the plaintiff is seeking cost for the sheet rock. As previously stated, Heath told the defendants there would be no charge in this matter.
As to the archway between the kitchen and the living room such was not in the plans. Defendant wanted an archway in that location after the sheet rock had been installed. The cost of the additional archway was $1250 and the cost for sheet rock due to the installation of the hood was $400.
After a lock set was installed, Mr. Blonder didn't like the handle so a new lock set was purchased for $176.58. This is allowed as an extra.
There is no allowance as extras for rehanging doors when carpet was installed or for repair of screen tracks.
Mr. Blonder wanted marble on the floor of the foyer. He purchased the marble but only paid a deposit. The plaintiff paid the $1651.87 plus $631.94 unpaid balance. There also was a charge of $356.58 for trucking. This allowed extra amounts to $2640.39.
The contract provided for a brick fireplace. Mr. Blonder wanted a marble facing and authorized the extra charge. The marble for the facing was $2600. The marble was installed by the Middletown Ceramic Tile. Their charge for the installation of the tile on the facing of the fireplace and the floor of the foyer was $3945. These allowed extras amount to $6545.
The plaintiff was charged $2,250 for extra painting ordered by the defendants mostly after work done by contractors hired by the defendants. The charge for painting the cupola is deducted from the bill as the court was told during trial that there would be no claim in relation to the cupola. This is allowed as an extra in the amount of $2070. CT Page 5634
Because of the raising of the house, it compelled painting the framing that replaced the wall. This extra painting was $784. This is allowed.
In this case, it is found that there were extras of $69,599.83.
C.G.S. 49-33(a) gives the right to a mechanic's lien to one who has furnished services and materials in the construction of a dwelling. C.G.S. 49-36 restricts a mechanic's lien to the price the owner agreed to pay. And, as previously stated, extras agreed upon by the parties may be added to the contract price to determine "the price which the owner agreed to pay."
On August 12, 1987, the contract price was $295,574.00. Thereafter in September 1987, there was a credit of $15,621.00 due to a change in the heating system leaving a new contract amount of $279,953.00. The contract made allowances of $2,980 for carpets purchased by the defendants and $2800 for light fixtures and paddle fans. This reduced the contract price to $274,173.00. The amount of extras found by the court amounted to $69,599.83 to be added to the final contract price of $274,173.00 would make "the price which the owner agreed to pay" $343,772.83. In this case Heath testified, and his testimony is accepted by the court in this instance, that his total expenditures, that is, the plaintiff's cost for services and materials was $326,481.62. Although in cross examination he admitted that this figure included his "time." It is clear that such was his renumeration under the contract other than the time spent on extras. His explanation was that the "General Contract Fee" of $28,000 represented his "time" included in his cash figure of $326,481.62 and this was paid out as salary for supervision of the job. This fee was figured into the contract at its inception. Such is a legitimate item of expense.
The object of C.G.S. 49-33 is not to enforce a contract or to recover damages for a breach but to foreclose a lien given by statute for services and materials furnished. Kiel v. Carll, 51 Conn. 440,443. The mention of a contract is only to establish a cap to recovery. In this instance the total cost of service and materials furnished is $326,481.62. This does not include profit and overhead in either the construction under the contract or in extras. Consequently the starting figure is $326,481.62 rather than $343,772.83 which was the figure arrived at as the price the owners agreed to pay. It was agreed that the defendants Blonder have already paid $280,417.16. This subtracted from $326,481.62 leaves $46,064.46 which would be owed if the defendants did not recover any of their claims in their special defenses.
In determining the special defenses of the defendants Blonder, the court is aware of the case of DuBose v. Carabetta, 161 Conn. 254
wherein the Supreme Court adopted the pleading practice established CT Page 5635 involving insurance policy cases to building contract cases. That being "where the plaintiff pleads performance of a building contract the defendant is required to plead separately any claim of defect, impropriety or unsuitability. . . .[t]he burden of proof remains on the plaintiff to prove performance concerning matters recited in the special defense." The court has found no case wherein this rule is made applicable to foreclosures of mechanic's liens.
Although the foreclosure of a mechanic's lien is for services and materials furnished an owner and not for the breach of a building contract, the rational underlining the requirements of the defendant to plead the claim of defect, impropriety or unsuitability in building contract cases is the same in foreclosures of mechanic's liens situation. Given the similarity of rational, it would appear appropriate to apply the pleading rules relative to special defenses formulated in DuBose to the mechanic's lien situation, and such will be applied here. The burden of proof however remains with the plaintiff. It appears that previous counsel for the Blonders anticipated this as there is an exhibit attached to the special defense listing defects.
Counsel for the plaintiff objected to any evidence of defects and the ground that such was not pleaded in accordance with the DuBose case. The objection was overruled as the court was not certain whether that ruling would apply to a mechanic's lien case. In searching the voluminous file, the answer and special defenses were found with Exhibit A. Not to further lengthen an already too lengthy trial, the court overruled all objections based on the DuBose case especially where claimed defects were not listed in the special defense, deciding to take care of the situation when writing the opinion.
Although the DuBose case puts the burden of listing defects upon the defendant, the burden of proof by a fair preponderance of the evidence is still upon the plaintiff to prove his case including the fact that such alleged defects did not exist or were not as a result of his work. The court applies this rule for all claimed defects whether already corrected or there is need of correction, although not specifically mentioned in the majority of the following paragraphs.
The defendants Blonder make claim in the following paragraphs for a reduction of any amount which may be found to be due under the mechanic's lien.
Before moving into the dwelling they paid $948 for staining floors that should have been done before they moved in. This amount is disallowed as not mentioned in Exhibit A in Special Defense.
Mr. Blonder claimed he wanted Baldwin lock set and bought it himself for $500. The contract limits lock set to Schlage. No deduction is allowed. CT Page 5636
The plumbing bill $781 to connect utilities and faulty plumbing is allowed as a deduction. This was done shortly after they moved in.
In September 1988, the defendants paid $95 to check heating system on flow of hot water. No work is listed as having been done. There is no deduction allowed.
In November 1988, they paid $60 to a carpenter to apply flashing around skylight which was leaking. This deduction is allowed.
From September to December 1988, they paid a carpenter $1568 to do work on the barn that needed to be corrected or was not finished. This deduction is allowed.
In October 1988, Berenson Woodworking was paid $6950 to correct various items not done in a workmanlike manner and which were defects. Included in the bill was work done such as installing storm doors, speaker covers which were not in the contract and which were not defects. The bulk of this bill is related to defects but the court cannot determine what amount they are and consequently must disallow the whole bill.
In late June 1987, Berenson installed four gable end vents with seal and was paid. This was due to the ridge vent not operating. This bill of $750 is not allowed as not within Exhibit A of the defendants' special defense.
A bill to DR Plumbing for $95 on hot water to the shower and kitchen is an allowable deduction.
In the fall of 1988, a carpenter worked in the barn correcting defects and finishing work started but not finished. (Exhibit 68.) The bill of $1477 is an allowable deduction.
A bill dated June 7, 1989, from M.C.B. is disallowed as part of work not within the list on Exhibit A of special defense.
The bill of $400 to clean windows and sweep the floor is disallowed as a defect.
Installation of gas range and the repair of the surface unit is disallowed. The purchase of appliances for $4781.75 is also disallowed as a deduction. Such was not within the contract, and further such is not a defect.
The defendants paid $90.30 for grills that should have been installed by the plaintiff. This is an allowable deduction.
The bill marked Exhibit 79 which the defendants paid appears to CT Page 5637 be for some kind of light fixture and paragraph 7c of the contract makes all charges for light fixtures over $2000 the responsibility of the defendants.
The defendant hired their own engineer and request payment of his bills. The plaintiff did not agree to pay this bill.
The defendants claim $574 for lock sets and various items from a company called West Hartford Lock. It was not proven if these items were not within those listed in paragraph 7g of the contract. This deduction is allowed.
In February 1989, trim for the foyer doors was purchased for $69.50. There were difficulties with the front door and the plaintiff did not prove such was not used. The deduction is allowed.
The defendants claim that $368.13 paid for mirrors was to be reimbursed to them by the plaintiff. These are not within the list of Exhibit A of their special defense, and such is not a defect or within the contract. This item is disallowed as a deduction.
The claim for $150 for retainers is disallowed as a deduction.
The defendant Mrs. Blonder testified that the color was wrong for a counter top and that the plaintiff would give a $275 credit. This deduction is allowed.
The defendants claims it would cost $6172 for top soil. This was not within the contract.
In the fall of 1988, the defendants engaged Distinctive Landscaping to correct the leaking of water into the basement. During the summer of 1988, after a heavy storm, water would leak through the rod holes and cracks in the basement floor and walls. The cause was that there were no swales to collect surface water in accordance with the plans. Three days after a rain storm water was still coming into the basement through cracks in the basement walls and tie holes. The clay around the outside of the basement wall was poor drainage soil.
Prior to a heavy storm in the summer of 1988 some landscaping work was done. The heavy storm washed it all away. The charges relating to this work is not considered.
It was decided after consultation that the soil around the basement would have to be dug up. After the soil was dug on three sides to the bottom of the house it was found that the rod holes had not been sealed and that there were no footings other than one footing drain was found. A pipe was found near the retaining wall but filled with soil. Footing drains were installed. Pipe was laid along the front and two sides of the foundation. The foundation was tarred. CT Page 5638 Stone and strip drain was added. Thereafter, swales were cut in accordance with "As Built Plans." The driveway was graded.
Distinctive Landscaping submitted a bill for $20,082.32. The defendants have deleted the work done before the heavy storm that was washed away. Also deleted were charges for added steps to the front door and related work; laying of brick, cost of cement to front steps; grading to seeding of wildflower area; and, seed and hay and labor in riding area. The resulting bill is $16,198.70. The court also deletes $1468.00 which was charged for finishing grading including riding area. The balance is $14,730.70. The total amount spent by the defendants to correct defects and finish work started and the correction of grading and water problem is $19,720.50.
The defendants engaged an expert in the building of dwellings to inspect their home in the month of November 1989. Some of his testimony related to cost of finishing the contract and did not relate to the defects of services and materials rendered as is the issue in this case. Such are not considered. Also items not mentioned in Exhibit A of the defendants' special defense are not considered. The claimed defects are discussed in the following paragraphs except those which were corrected by the defendants which have been previously considered.
The retaining wall, the roof, and chimney flashing were not mentioned in Exhibit A of special defense and are not considered.
Skylight flashings have been considered previously.
Considerable evidence was presented about the poor workmanship in the construction of the rear deck. No useful purpose would be served to repeat all of the defects described. The photo exhibits dramatically illustrate the problems. The estimate to correct this situation is $2900. This estimate is accepted and is a deductible allowance. The deck was not constructed in accordance with the original plan. The court allowed $1247.84 for the change. The plaintiff did not prove the claimed defects concerning the deck were not present or as testified to. Consequently the defendants are entitled to recover for the deck as it was altered.
The cost to stain the deck is disallowed as it is not within the contract and is not a defect.
The risers in the stairs going to the basement are claimed to be uneven; the rails are claimed to be loose; no drywall on either side of stairs; inadequate headroom at top of stairs; no light in stairwell; defective joists and blocking; insulation not properly cut; which the expert claims are all defective in some manner are not considered as they are not included in Exhibit A of the defendants' special defense. CT Page 5639
The shrinkage of cracks on the basement floor are not indications of poor workmanship.
There is a major crack in the westerly wall which allowed water to penetrate into the cellar. The expert felt that waterproofing the outside wall would correct the situation. That was one of the corrections that Distinctive Landscaping did for which deduction was allowed. This would also apply to the easterly wall. The plaintiff has proven that the basement floor was done with good workmanship.
The remainder of the claimed defects in the basement are not included in Exhibit A of the defendants' special defense.
The defendants' expert made a general observation as to the floor surfaces in all rooms of various defects he saw and lumped up the cost of repairing them as $6000. This estimate is too general and there is not sufficient evidence of the different defects to form a reasonable basis for the estimate.
As to the swinging doors, none of them fit and others had gaps when closed. There was poor workmanship involved in hanging and fitting these doors. The estimate of $500 is allowed as a deduction.
The estimate for repair to the front door is disallowed. This door was repaired by Berenson in the fall of 1988 and the instant inspection was in 1989. The door is not as it was left by the plaintiff.
Much of the grout in the front foyer tile is missing. The estimate cost of $300 is accepted and is an allowable deduction.
The defects in the molding, light, handrail and stairs in the foyer are not listed in Exhibit A and are not considered.
In the living room there are large cracks due to poor workmanship. The estimate of $500 to repair these defects is accepted as an allowable deduction.
The reason the two cannister lights in the living room that do not operate is unknown. No allowance is made.
There is no allowance for two missing receptacles plugs, or base heating elements. These are not defects or poor workmanship. That is an omission for which the plaintiff is not seeking recovery.
The living room doors need adjusting to stop the door dragging on the sill. The estimate of $50 is an allowable deduction.
There is no allowance for items claimed as defects in the kitchen CT Page 5640 and laundry room. The absence of light receptacles are not defects but omissions from the contract. The crack in the dry wall was not listed in Exhibit A of the defendants' special defense.
The window trim paint is peeling in the half bathroom. The estimated cost of $125 is accepted as an allowable deduction.
There is a claim for a defective stairway in the master bedroom. This defect was not included in Exhibit A of defendants' special defense and is disallowed.
Repairs to atrium door in master bedroom is not included in Exhibit A of defendants' special defense. As the painting is lumped in with door defect there is no allowable deduction.
The height of the wall plugs is not found to be a defect.
The claim for cracked tile and the grouting around the Jacuzzi is not listed in Exhibit A of defendants' special defense and is disallowed.
The shower door being out of adjustment is not listed in Exhibit A of defendants' special defense and is disallowed.
There is water damage in the ceiling of the den and tape is pulling away. It has to be retaped, primed and painted. The closet door trim has water damage. It should be scrapped and painted. To correct these damages, it is estimated that each will cost $150. These are allowable deductions.
In the television room, water leaked in and caused the dry wall tape to peel away from the walls and corners. It is estimated that to correct this defect would be $175. This is allowed.
The corner bead at the second floor level has buckled and pulled away. The reason for the buckling is unknown. No deduction is allowed.
The defects in the half bath are not listed in Exhibit A of the defendants' special defense and are not allowed.
There is no mention in Exhibit A of the defendants' special defense of any defects in the attic other than a claim to "trim out access to attic" with no further explanation. None of the defendants' expert's testimony referred to this item. The remainder of testimony in regard to the attic is to defects not appearing in Exhibit A of the defendants' special defense.
As to the defects in the barn, the doors do not have jambs only 2"x6" casings. This denotes poor workmanship. To rectify this would require an expenditure of $350 which amount is allowed as a deduction. CT Page 5641
The sliding doors need adjustment. A centerstop and the bent track require to be replaced. To require these defects to be corrected will cost $350 and such is an allowable deduction.
The absence of stair rails and guards at stair opening are not listed in Exhibit A of the defendants' special defense. It is not considered.
There is no bridging between the lapped left floor joist. The cost of correcting this defect is estimated at $150 and it is an allowable deduction.
The joist hangers in the garage area are not properly nailed. The estimated cost to rectify this defect is $100. This is an allowable deduction.
The defendants' expert estimated the cost to correct the defective nailing pattern to be $3300. These defects are not mentioned in Exhibit A of the defendants' special defense and are not considered.
The rafters plumb out of the ridge of the barn is open at the bottom. It is estimated that the cost to be shimmed at the bottom to prevent splitting will be $80. This is an allowable deduction.
The defendants' expert inspected the leaching field area of the premises on September 11, 1990. His opinion was that the area required fill in the area of the field above the original grade and he found none. He made no estimate of what the fill would cost. His only estimate was a replacement cost of $7,200. There is no estimate of what additional fill would be to raise the surface 18" over water level. This estimate is not accepted as a cost to correcting the deficiencies.
There are considerable testimony by other witnesses concerning the septic system. It is admitted that the north end of the field was moved five feet. This change was by order of the sanitarian so as to comply with the contour of the land. On December 21, 1987, he approved the septic system. Again on June 13, 1988, he approved the certificate of occupancy issued July 13, 1988. It is noteworthy that at the time of trial about a year and a half after the defendants moved in, there is no evidence that any work was done on the septic system to alleviate the problems that were testified to concerning the septic system. There is a question in the mind of the court how deficient the septic system was up to the time of trial. At any rate, what it would cost to correct the deficiencies rather than replace the system was not put into evidence. No deduction is allowed. It is also the opinion of the court that a septic system is an essential part of a building contract where there is no municipal sewage system. Consequently, CT Page 5642 defects in the system should have been included in Exhibit A of the defendants' special defense, and, they were not.
The defendants' expert inspected the exterior painting in November 1989. The only comment he had about the exterior painting was that there were several areas where the paint was peeling and that he estimated it would cost $750 to scrape and paint but warned that the moisture must be removed from the home. In September 1990, after the trial of this case had begun, he again inspected the exterior painting of the house. He found the condition of the exterior finish had worsened considerably. His opinion was that the cost of scraping and repainting would cost $8,500. The painting contractor who was hired by the plaintiff to do the exterior painting as well as the interior painting was shown photos of the exterior of the dwelling. He stated he would not expect the peeling of paint as shown on the photo. He then stated that he would do the painting over for nothing. The court is satisfied that the painting was defective and a deduction for such painting should be allowed. The sum of $8500 is a reasonable deductable allowance.
The defects which the defendants Blonder's expert found and which were accepted as deductable allowances amount to $14,380.00. This sum added to $19,720.50 found to have been spent by the defendants Blonder as allowable deductions makes a total of $34,100.50 which should be deducted from the $46,064.46 previously determined to be the amount recoverable by the plaintiff if no deductions were allowed. The debt owed by the defendants Blonder to the plaintiff is $11,963.96. As previously stated, the mechanic's lien was found to be sufficiant as a basis of a foreclosure.
There was no appraised value of the premises put into evidence but it is unquestioned that that value is way beyond the debt found.
An attorney's fee of $10,000 is awarded. This is based only on the court appearance during trial and brief, and does not include that part of trial devoted to the second count. The court has no other evidence relating to other legal work.
It was stipulated that the defendant Community National Bank mortgage was dated December 22, 1987, and recorded in the Hebron Town Hall on December 23, 1987. It is a lien subsequent to that of the plaintiff.
There is no motion for a foreclosure by sale.
Judgment may enter of strict foreclosure. However, the court is receptive to granting a foreclosure by sale if any party so desires.
The first law day for the Community National Bank is September 3, 1991. The second law day for the defendants Blonder is September 4, CT Page 5643 1991.
SECOND COUNT
The complaint is dated August 29, 1988. By an amended complaint dated October 20, 1989, the plaintiff added a second count which in effect charged the defendants Blonder with a violation of C.G.S.42-110a, et seq. commonly known as CUTPA.
It is alleged that on or about August 12, 1987, the plaintiff and the defendants Blonder entered into an agreement whereby the plaintiff would construct a dwelling and barn for said defendants on land owned by them located at 47 London Road in Hebron.
It is further alleged that the agreement was not an isolated transaction but one of several among the plaintiff and said defendants which will be discussed hereafter. During the course of building the dwelling and barn, extras were ordered and deviation from the contract were requested by the said defendants. In order to induce the plaintiff to perform these extras and deviations it is alleged that the defendants embarked upon a deliberate and systematic scheme of deceptive acts and practices in the course of trade and commerce. Braford Heath, president of the plaintiff, testified that Ira Blonder told him he was in real estate development and suggested a joint venture between them in at least four projects. This was denied by Ira Blonder.
The written partnerships involving some kind of building operation at Marjorie Circle in Hebron and in Chestnut Hill were between the Blonders and Mr. and Mrs. Heath individually. No mention is made of the plaintiff in either agreement. Heath claimed that it was agreed that the plaintiff would be the builder in each instance. The defendant Ira Blonder denied any such agreement in either instance. No testimony was presented as to extent of the activities or involvement of the plaintiff or the defendants in these partnerships. It is found that the plaintiff has not proved by a fair preponderance of the evidence any involvement or promise of any participation in these two partnerships.
Heath claimed an agreement with Ira Blonder in which the latter was to present a partnership agreement involving a 47 acre parcel of land in Montville in which Ira had an option to purchase and that the plaintiff would be the builder. Ira Blonder denied any involvement in this. No evidence was presented whether Blonder ever got title, built any structure on this land or otherwise involved in this parcel. It is found that the plaintiff has failed to prove by a fair preponderance of the evidence any involvement or promises of participation in the so-called Montville parcel. Although the court does believe there was some conversation between Heath and Ira Blonder about the Montville parcel, its content is unknown. CT Page 5644
It is alleged in the second count in addition to the above that the Blonders promised the plaintiff that to offset the charges for deviation from the building contract and extras they would give him a 5% interest in an eighty lot development in South Windsor, which they claimed to have had a half interest. It was to be developed and the plaintiff would build 50% of the homes in said development. When or if this alleged promise was made and whether it was made for the reason claimed has not been proven. The defendants deny making any such agreement. It is probable that some discussion involving all of the above properties occurred at some time between Heath and the defendants but their contents and the circumstances surrounding these discussions have not been proven by the plaintiff much less of promises to the plaintiff corporation. Further, it is unknown if any buildings were built on these parcels of land or sold from these other parcels or if any other activity occurred. Also it is unknown if the Blonders had any interest in the South Windsor land at the time the defendants' dwelling was being built.
The plaintiff also alleges that the defendants Blonder gave an $8500 tractor to the plaintiff and later asked to be paid. Heath paid Ira Blonder $8500 and Heath claims Ira told him he would repay him in other ways. Ira Blonder claims he sold the tractor to Heath. It is found that the tractor was sold to Heath.
Finally, the plaintiff alleged that he was told not to bill the extras as they occurred but to save them and that they would be offset by other work thrown to the plaintiff. Heath testified that he understood from the defendants that the plaintiff was to get enough of other work "to offset the extra charges. If they were to happen Mr. Blonder said that he expected the American Home Builders would forgive the extra charges." Counsel for the Blonders asked "that would be gratuitous on the part of American Home Builders toward him?" Heath replied, "Yes sir." Counsel for Blonder asked, "so that never happened did it, and you didn't forgive him, did you?" Heath replied, "I didn't for . . .American Home Builders did not forgive for the extra charges because they weren't compensated in any other way." The court fails to see any unfairness, deception or resulting substantial injury.
The evidence presented by the plaintiff does not support the plaintiff's position in the second count.
C.G.S. 42-110b provides that "[n]o person shall engage in. . .unfair or deceptive acts or practices in the conduct of any trade or business." In determining whether this action or practice in question violate CUTPA, courts employ the following criteria:
 "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established CT Page 5645 by statutes, the common law, otherwise. . .whether, in other words, it is within the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers, . . . ."
Conaway v. Prestia, 191 Conn. 484, 492, quoting FTC v. Sperry 
Hutchinson, 405 U.S. 233.
Taking into consideration the exact testimony of the plaintiff's president regarding the statement by Ira Blonder relating to the delay in charging for extras it is clear that there was no promise to give other work to the plaintiff in lieu of extra charges but only that if enough other work was given to the plaintiff, it would feel compensated for the extras and would forgive them. This, in addition to the lack of findings of the other claims of joint ventures or agreements, compels the court to find that the second count has not been proven.
ALVA P. LOISELLE STATE TRIAL REFEREE